**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**26 Cr. 007 (RPK)**

------------------------------------------------------------------------------------------

**UNITED STATES OF AMERICA,**

**-against-**

**RENAT ABRAMOV**

*Defendant.*

------------------------------------------------------------------------------------------

# SENTENCING MEMORANDUM
# ON BEHALF OF RENAT ABRAMOV

By:  James Kousouros, Esq.
Law Offices of James Kousouros
*Attorney for Mr. Abramov*
260 Madison Avenue, 22nd Floor
New York, New York 10016
Tel: (212) 532-1934
Fax: (212) 532-1939
James@kousouroslaw.com

**TABLE OF CONTENTS**

Preliminary Statement ........................................................................................................1

The Offense Conduct........................................................................................................2

Our Request For a Non-Guidelines Sentence....................................................................4

    a.    United States Sentencing Guideline § 2B1.1.........................................................6

    b.    Minor Role Adjustment.......................................................................................10

        i.    Legal Standard.................................................................................................11

        ii.    Argument.........................................................................................................13

    c.    Personal History and Characteristics of Renat Abramov ....................................14

        i.    Family History and Religious Persecution .......................................................15

        ii.    Employment, Marriage, Fatherhood, and a Household That Depends on Him ............17

        iii.    Genuine Rehabilitation and Spiritual Growth Since Arrest .........................................18

        iv.    Letters in Support of Mr. Abramov ...............................................................19

    d.    ██████████████████ ...................................................................21

    e.    18 U.S.C. § 3553(a)(2)(A), (B) and (C): The Need for the Sentence Imposed to Reflect the Purposes of Punishment Contained in the Federal Sentencing Statute...............................22

Conclusion .....................................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ...................................................................................4

*Pepper v. United States*, 131 S. Ct. 1229 (2011)........................................................................5, 6

*United States v Algahaim*, 842 F. 3d 796 (2d Cir. 2016) .............................................................6

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ................................................9

*United States v. Ajmal*, 67 F.3d 12 (2d Cir. 1995) ...................................................................12

*United States v. Booker*, 543 U.S. 220 (2005)............................................................................3

*United States v. Carpenter*, 252 F.3d 230 (2d Cir. 2001).........................................................11

*United States v. Castaño*, 234 F.3d 111 (2d Cir. 2000)............................................................11

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) ...............................................................4

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013)................................................................6

*United States v. Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004)........................................8

*United States v. Faibish*, 12-cr-265, 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015) .......................8

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) ..................................................4

*United States v. Jimenez-Beltre*, 440 F.3d 514 (1st Cir. 2006) ..................................................4

*United States v. Johnson*, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ......................................8

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008)..................................................................4

*United States v. Musgrave*, 647 F. App'x 529 (6th Cir. 2016)....................................................8

*United States v. Myers*, 353 F. Supp 2d 1026 (U.S. Dist. Ct. S.D. Iowa, Pratt, DJ, 2005) .............4

*United States v. Neils*, 156 F.3d 382 (2d Cir. 1998)..................................................................12

*United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008)....................................................9

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999)...............................................................12

*United States v. Shonubi*, 998 F.2d 84 (2d Cir. 1993)...............................................................12

*United States v. Vonner*, 516 F.3d 382 (6th Cir. 2008) ..............................................................4


**Statutes**

18 U.S.C. § 1956 ..........................................................................................................................2

18 U.S.C. § 3553(a).................................................................................................................3, 5, 23

18 U.S.C. § 3661 ..........................................................................................................................4

**Regulations**

U.S.S.G. § 2B1.1 ...........................................................................................................6

U.S.S.G. § 2B1.1(b)(1)(J) ..............................................................................................2

U.S.S.G. § 2S1.1(a)(2) ...................................................................................................2

U.S.S.G. § 2S1.1(b)(2)(B) ..............................................................................................2

U.S.S.G. § 3B1.2 ............................................................................................................3

U.S.S.G. § 3B1.2(b) ......................................................................................................11

U.S.S.G. § 3E1.1(a) ........................................................................................................3

U.S.S.G. § 3E1.1(b) ........................................................................................................3

U.S.S.G. § 4C1.1(a) ........................................................................................................3

U.S.S.G. § 4C1.1(b) ........................................................................................................3

## LIST OF EXHIBITS

**Exhibit A:**    Aleph Institute Letter Addressed to Probation Officer Ralph

**Exhibit B:**    Aleph Institute Letter Addressed to Judge Rachel P. Kovner

**Exhibit C:**    Sentencing Video

**Exhibit D:**    Letters in Support of Renat Abramov

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------
**UNITED STATES OF AMERICA,**

                                                                    **-v-**                                                                    **26 Cr. 007 (RPK)**

**RENAT ABRAMOV,**

                                **Defendant.**
-------------------------------------------------------

## SENTENCING MEMORANDUM

### *Preliminary Statement*

This memorandum is respectfully submitted on behalf of Renat Abramov, who is scheduled to be sentenced by the Honorable Rachel P. Kovner, United States District Court Judge for the Eastern District of New York on August 10, 2026. For the reasons set forth below, we respectfully request that the Court consider a variance from the stipulated guideline range in this case.

Mr. Abramov is 36 years old. He came to the United States at the age of ten having fled Azerbaijan with his family as a result of extreme antisemitism. He endured a difficult childhood and yet emerged as a responsible son and father who worked hard to support his family. Mr. Abramov has been married for nine years and has two young children in whose lives he is deeply involved. He has no prior criminal history as this is his first encounter with the criminal justice system.

Mr. Abramov fully accepts responsibility for his conduct in this case and the impending separation from his family has devastated his wife and his children. As the letters submitted herewith amply demonstrate, Mr. Abramov is an otherwise compassionate man, always willing to help those in need and a devoted husband and father. He has done his best to atone for his conduct both personally and in his message to others in the community. █████████████████████████

1

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

We respectfully submit that there are mitigating circumstances that warrant consideration of a variance from the advisory guidelines. These include Mr. Abramov's role in the offense, his complete acceptance of responsibility, ████████████████████████████████, his personal history and circumstances and otherwise unblemished life history. We further ask the Court to consider the outsized effect of the fraud guidelines when applied to Mr. Abramov.

**The Offense Conduct**

For the past several years, Mr. Abramov was employed at banks in New York, first as a teller and later as a relationship manager primarily responsible for opening accounts and tending to the needs of the bank's customers. He excelled during his tenure at these institutions as he and his wife started raising their children. During the period involved in this case, he was employed at the Sheepshead Bay, Brooklyn branch of Bank of America. Mr. Abramov opened five accounts into which proceeds of health care fraud were deposited and later withdrawn. He did not participate in the underlying fraud or share in the profits. He was paid minimal amounts to open the accounts. These funds will be forfeited before or at the sentencing. He has admitted knowledge that the clients were straw owners but was unaware of the source of the funds. He deeply regrets his misguided judgment as it has so detrimentally upended his and his family's life.

**United States Sentencing Guidelines**

The Plea Agreement provided for the following guidelines analysis:

Base Offense Level (U.S.S.G. § 2S1.1(a)(2) & U.S.S.G. § 2B1.1(b)(1)(J)):          +26

*This amount is based upon the amounts deposited into the accounts opened by Mr. Abramov.*

| | |
|---|---|
| Conviction pursuant to 18 U.S.C. § 1956 (U.S.S.G. § 2S1.1(b)(2)(B)) | +2 |
| Adjusted Offense Level: | 28 |
| Acceptance of Responsibility (U.S.S.G. §§ 3E1.1(a) & (b)): | -3 |
| Chapter Four Adjustment (U.S.S.G. §§ 4C1.1(a) & (b)): | -2 |
| Total Offense Level: | 23 |

Criminal History Category I

Based upon the foregoing, with a Total Offense Level of 23 and a Criminal History Category I, the advisory guideline range per the Plea Agreement is 46-57 months. The Plea Agreement further provides that Mr. Abramov reserves the right to argue that a mitigating role adjustment pursuant to U.S.S.G. § 3B1.2 should be applied to the guideline calculations.

The Department of Probation has calculated the guidelines in comportment with the Plea Agreement and as provided for in the Plea Agreement, Mr. Abramov accepts this calculation with the exception of the applicability of a minor role adjustment. Mr. Abramov otherwise consents to the guideline calculations provided for in the Plea Agreement and adopted by the Department of Probation.

After a thorough and inciteful analysis of Mr. Abramov's role in the offense, his personal history and circumstances and the remaining factors in 18 U.S.C. § 3553(a), the Department of Probation has recommended a variance and a sentence of 12 months and one day. We are grateful for this recommendation and respectfully agree that a substantial variance is appropriate in this case.

Mr. Abramov is a decent man, who understands that he made a huge mistake in committing the conduct in this case. While the guidelines must be calculated and considered, they are but one factor—in some instances arbitrarily constructed to ascribe a number to a situation and individual

without corresponding significance assessed to the remaining factors in 18 U.S.C. § 3553(a). We respectfully submit that a variance should be considered in this case.

**Our Request For a Non-Guidelines Sentence**

In the aftermath of *United States v. Booker*, 543 U.S. 220 (2005) and its progeny, a non-guidelines sentence is clearly within this Court's discretion. This Court has "considerable discretion in identifying the grounds that can justify a non-Guidelines sentence." *United States v. Jones*, 531 F.3d 163, 168 n.5 (2d Cir. 2008) (Raggi, J.). The sentencing court, after first identifying the applicable guideline range, can impose a non-guidelines sentence upon a finding of "sufficient justification" for the sentence imposed. *See Gall v. United States*, 552 U.S. 38 (2007). "A sentencing judge has a very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime. No limitation is placed upon the information concerning a defendant's background and the conduct in issue that can be considered by the court in making its sentencing determination." *United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008). *See also* 18 U.S.C. § 3661.

As the First Circuit recognized in *United States v. Jimenez-Beltre*, 440 F.3d 514, 527 (1st Cir. 2006) (Lipez, J. dissenting), the "guidelines are inescapably generalizations" that often say little about the "history and characteristics of the defendant." *See also United States v. Myers*, 353 F. Supp 2d 1026 (U.S. Dist. Ct. S.D. Iowa, Pratt, DJ, 2005). And, as stated by the Sixth Circuit "*Booker* breathes life into the authority of district court judges to engage in individualized sentencing within reason in applying the § 3553(a) factors to the criminal defendants that come before them." *United States v. Vonner*, 516 F.3d 382, 392 (6th Cir. 2008) (en banc). Judge Rakoff, in sentencing defendant Gupta in *United States v. Gupta*, justified a non-guidelines sentence observing: "[h]uman beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results." *United States v. Gupta*,

4

904 F. Supp. 2d 349 (S.D.N.Y. 2012). Human beings are complicated, and it is for this reason that the factors set forth in 18 U.S.C. § 3553(a) require a full understanding of the individual while also considering the facts surrounding the offense conduct.

These decisions universally embrace the discretion now afforded to district court judges who have "access to, and greater familiarity with, the individual case and the individual defendant" to be sentenced to make the "individualized assessment[s]" so often constrained by the once mandatory guidelines. With this discretion we can trust that "every convicted person be considered as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011).

Thus, while consideration of the guidelines is in order, the Court must now be guided, in the final analysis, by all of the factors set forth in 18 U.S.C. § 3553(a). These factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B)    to afford adequate deterrence to criminal conduct;
>>
>> (C)    to protect the public from further crimes of the defendant; and
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for—
>
>> (A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

…

> (6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. § 3553(a).

In fashioning an appropriate sentence, the overarching mandate of the sentencing court is the "parsimony principle"—to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" 18 U.S.C. § 3553. *Pepper v. United States*, at 1243.

We respectfully submit that the nature and circumstances of the instant offense and Mr. Abramov's personal history, characteristics and familial obligations warrant consideration of a sentence that will minimize the separation of Mr. Abramov from his family and facilitate his continued employment and law-abiding life.

a.   United States Sentencing Guideline § 2B1.1

The adjustments provided for by U.S.S.G. § 2B1.1 are the single most impactful adjustments in fraud cases and while the resulting offense level may technically fit within the numerically fixed guidelines, they often do not befit the individual to be sentenced. While we do not minimize the seriousness of Mr. Abramov's conduct in this case, the fact remains that his guidelines are almost entirely driven by the loss amount of the underlying fraud with which he had nothing to do with. The actual perpetrators of this fraud would suffer the same loss adjustment as Mr. Abramov. We submit that the guidelines for Mr. Abramov overstate his culpability.

In recent years, Courts have examined whether guideline increases based on loss are unreasonable or penologically counterproductive and have increasingly embraced the opportunity to correct any injustice precipitated by this adjustment. The loss table, "unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *United*

6

*States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring); *United States v Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).

Given the flawed policies behind the Loss Table, it is not surprising that there is a "widespread perception that [§ 2B1.1] is broken[,] leav[ing] district judges without meaningful guidance in high-loss cases." *Corsey*, 723 F.3d at 378; *see also* Barry Bross & Kara Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save it*, 18 Ohio St. J. Crim. L. 605, 619 (2021) ("[A] broad judicial consensus has developed that Section 2B1.1's loss table overstates culpability in a great many cases."). As "a well-known sentencing commentator has put it":

> For the small class of defendants convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense. Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges.

*Corsey*, 723 F.3d at 380 (quoting Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent'g Rep. 167, 168 (2008)); *see also How the Economic Loss Guideline Lost its Way, and How to Save it* at 619 ("Especially as the loss amount increases into the millions, the sentences recommended by the loss table are widely viewed as unduly severe, increasingly arbitrary, and manifestly disproportionate to the non-violent nature of the underlying economic crimes." Mark W. Bennett, Justin D. Levinson, Koichi Hioki, *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 958, 983 (2017).

Several district judges in the Second Circuit have issued strong opinions rejecting the Loss Table. For example, former S.D.N.Y. District Court Judge Gerard E. Lynch, called the Loss Table "questionable" noting that "[t]he Guidelines place undue weight on the amount of loss involved in the fraud …, attempting—no doubt in an effort to fit the infinite variations on the theme of greed

into a limited set of narrow sentencing boxes—to assign precise weights to the theft of different dollar amounts…. Were less emphasis placed on the overly rigid loss table, the identification of different types of fraud or theft offenses of greater or lesser moral culpability or danger to society would perhaps assume greater significance in assessing the seriousness of different frauds." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427–28 (S.D.N.Y. 2004).

In 2018, E.D.N.Y. District Judge Nicholas G. Garaufis added his "name to th[e] lengthy list of judges, practitioners, scholars, and other commentators" who "have urged the Sentencing Commission to right th[e] grievous wrong [of the Loss Table]." *United States v. Johnson*, 2018 WL 1997975, at 4 (E.D.N.Y. Apr. 27, 2018); *see id.* ("[A decade ago,] the American Bar Association [and others] . . . urged the Commission to overhaul the fraud Guideline to reduce the unwarranted emphasis on . . . loss . . . that . . . tend[s] to overstate the seriousness of many offenses. . . . Still, though, the Commission persisted in sticking to its flawed methodology for tabulating white-collar sentences."). Judge Garaufis found it "particularly galling that [loss] is often more or less *solely* responsible for a white-collar offender's Guidelines sentence" when the "loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime." *Id.* at 3. Although the applicable Guidelines range in Judge Garaufis's case was 87–108 months' imprisonment, he "refuse[d] to mechanistically impose such an illogical sentence" based on the Loss Table and instead imposed a 24-month prison sentence:

> [T]he Guidelines would have this court place Johnson in jail for almost a decade without batting an eyelash simply because of the sizeable profit from the frontrunning trades. The Guidelines do not ask the court to consider the duration of the criminal activity, Johnson's *mens rea*, the character of the loss, or any other factors that might allow the court to impose a sentence based on Johnson's worth. No, the threefold increase in Johnson's offense level does not

come as a result of any of these significantly more important considerations.

*Id.*; *see also, e.g.*, *United States v. Musgrave*, 647 F. App'x 529, 538 (6th Cir. 2016); *United States v. Faibish*, 12-cr-265, 2015 WL 4637013, at *2–3 (E.D.N.Y. Aug. 3, 2015) (Vitaliano, J.) ("The loss table is but one example of the seemingly mindless acceleration of penalties for economic crimes incorporated in the current Sentencing Guidelines regime.… [A] strict application of the existing guidelines derived from the existing loss table in this case would unfairly balloon [the defendant's] sentencing range beyond any reasonable proportion to his crimes.… [T]he precise loss amount … will not factor into … the Court's sentence."); *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (Block, J.) (criticizing the Loss Table as "a black stain on common sense"); *United States v. Gupta*, 904 F. Supp. 2d 349, 350–51 (S.D.N.Y. 2012) (Rakoff, J.) ("By making a Guidelines sentence turn, for all practical purposes, on [the amount of loss], the Sentencing Commission . . . effectively guaranteed that many such sentences would be irrational on their face."); *United States v. Adelson*, 441 F. Supp. 2d 506, 507, 512 (S.D.N.Y. 2006) (Rakoff, J.) ("the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic" and "the harm that guideline calculations can visit on human beings if not cabined by common sense"), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (affirming downward variance).

Sentencing statistics demonstrate that district judges nationwide recognize the multiple flaws in the Loss Table. In 2025, approximately 41.2% (or 2,077 out of 5,044) of the defendants convicted of fraud/theft/embezzlement offenses received a downward variance. *See* U.S. Sent. Comm'n, *2025 Annual Report and Sourcebook of Federal Sentencing Statistics*,[1] at 72, 101; *see also, How the Economic Loss Guideline Lost its Way, and How to Save it* at 622 ("[T]he national

---

[1] *Available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2025/2025_Sourcebook.pdf.

data shows that courts vary below the Guideline range under 2B1.1 with higher frequency than in general, and, in so doing, grant substantial variances downward."); Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 19 (2013) ("[T]he Commission's sentencing data . . . suggest that loss is an unsound measure of the seriousness of many offenses, with the result that judges are increasingly willing to go below the Guidelines when they impose sentences in white-collar cases.").

We fully appreciate the seriousness of the underlying offense and the fact that Mr. Abramov's opening of the accounts facilitated the movement of stolen money. The problem is that the guidelines consider a loss amount as applicable to all defendants irrespective of their role in the offense, whether they profited from the offense and whether they were otherwise pre-disposed to steal. Mr. Abramov was not involved in the underlying fraud, he did not cause the losses for which he is responsible under the guidelines and he was paid close to nothing to open the accounts. His guidelines—which apply with equal force to the actual perpetrators—clearly overstate his comparable culpability in this case. We respectfully ask this Honorable Court to consider this and give the advisory guidelines less weight than they advise.

b.  Minor Role Adjustment

As provided for in the Plea Agreement, we respectfully submit that a two-level minor role adjustment should be applied pursuant to U.S.S.G. § 3B1.2(b). Mr. Abramov was a bank employee whose entire involvement consisted of opening bank accounts. He had no knowledge of the underlying durable medical equipment fraud, played no part in it and exercised no control over the $6 million that others moved through the accounts. He did not share in the proceeds of the underlying fraud. He was paid $12,500, which he has agreed to forfeit. On these facts, Mr.

Abramov is precisely the kind of low-level, peripheral participant for whom the Sentencing Commission designed the mitigating role adjustment, and for whom it strengthened that adjustment in Amendment 794.

   i.  <u>Legal Standard</u>

Section 3B1.2(b) provides for a two-level decrease in the offense level "[i]f the defendant was a minor participant in any criminal activity." A minor participant is one "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, cmt. n.5. The adjustment is available to a defendant "who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity." *Id.* cmt. n.3(A). The determination is "heavily dependent upon the facts of the particular case." *Id.* cmt. n.3(C). The defendant bears the burden of establishing entitlement to the adjustment by a preponderance of the evidence. *United States v. Carpenter*, 252 F.3d 230, 234 (2d Cir. 2001); *United States v. Castaño*, 234 F.3d 111, 113 (2d Cir. 2000).

The Second Circuit has instructed that the role inquiry is "highly fact-specific" and turns on the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise. *United States v. Shonubi*, 998 F.2d 84, 90 (2d Cir. 1993); accord *Carpenter*, 252 F.3d at 234; *see also United States v. Neils*, 156 F.3d 382, 383 (2d Cir. 1998) (per curiam) (court gauges culpability relative to the elements of the offense of conviction and relative to co-conspirators).

Effective November 1, 2015, Amendment 794 clarified § 3B1.2 in three respects that bear directly on this case. First, it resolved that the comparison is to the average participant "in the criminal activity"— that is, to the actual co-participants in the defendant's own offense—not to

some hypothetical average offender. U.S.S.G. App. C, Amend. 794; U.S.S.G. § 3B1.2, cmt. n.3(A). The Amendment acknowledges the circuit split between framing the inquiry to the "case at hand" versus "the universe of persons participating in similar crimes." U.S.S.G. App. C, Amend. 794. To the extent earlier Second Circuit decisions framed the comparison as against "the average participant in such a crime," e.g., *United States v. Rahman*, 189 F.3d 88, 159 (2d Cir. 1999) (per curiam); *United States v. Ajmal*, 67 F.3d 12, 18 (2d Cir. 1995), the amended commentary embraced the "case at hand" approach and focused on the average participants in the criminal activity.

Second, Amendment 794 added a non-exhaustive list of factors the court "should consider": (i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity; and (v) the degree to which the defendant stood to benefit from the criminal activity. U.S.S.G. App. C, Amend. 794.

Third, the amended commentary resonates to the very facts herein: a defendant who is "accountable under § 1B1.3 (Relevant Conduct) only for the conduct in which the defendant personally was involved," who performed a limited function, may receive the adjustment—and, specifically, a defendant held accountable for "a loss amount under § 2B1.1 (Theft, Property Destruction, and Fraud) that greatly exceeds the defendant's personal gain from a fraud offense *or* who had limited knowledge of the scope of the scheme" may receive an adjustment. U.S.S.G. § 3B1.2, cmt. n.3(A) (emphasis added). Amendment 794 changed the conjunctive "and" to the disjunctive "or," making either circumstance independently sufficient to support the adjustment. This permissive note in the amendment dovetails with the excessive adjustment applied in this

12

case pursuant to § 2B1.1. It is, we submit, a recognition by the Commission that the adjustments under § 2B1.1 often do overstate the culpability of a defendant. As discussed, *infra*, Mr. Abramov satisfies both.

Finally, the Commission promulgated Amendment 794 because its case review showed that mitigating role adjustments were being applied inconsistently and "more sparingly than the Commission intended," particularly to low-level offenders. U.S.S.G. App. C, Amend. 794 (Reason for Amendment). We respectfully submit that this Honorable Court should apply the adjustment to the extant facts and circumstances.

ii. Argument

The relevant universe of participants in this case includes the principals of the fraudulent DME companies who conceived, organized, and executed a healthcare fraud that generated millions of dollars, and who then directed the deposit and withdrawal of those proceeds through the accounts. Measured against those participants—as Amendment 794 requires—Mr. Abramov's role was categorically different in kind and degree. He was a bank employee who performed a single, concededly important but ministerial function: opening accounts. He did not recruit patients or providers, submit claims, create the sham companies, move money, structure withdrawals, or direct anyone to do anything.[2]

Because Mr. Abramov pled guilty to money laundering, Chapter Three adjustments are determined on the basis of the laundering offense itself. *See* U.S.S.G. § 2S1.1, cmt. n.2(C). That

---

[2] By contrast we note the related case of *United States v. Elnar Zarbailov*, 25 Cr. 300 (RPK). Mr. Abramov opened two Bank of America accounts for Elnar Zarbailov. Mr. Zarbailov was sentenced by this Court to 37 months' imprisonment. His guideline range was 37 to 46 months' imprisonment. Mr. Zarbailov agreed to forfeit $1,457,898.33. While Mr. Zarbailov's guidelines were lower than those of Mr. Abramov, this was due to the § 2B1.1 adjustment related to the funds Zarbailov controlled. And yet, the Government described Mr. Zarbailov as a critical participant in the underlying fraud. *See* D.E. 45. Mr. Abramov was not a participant in the underlying fraud and yet, due to the amount of funds that passed through the accounts, his guidelines are exponentially higher.

framing does not change the result. Even within the money laundering conduct, Mr. Abramov occupied the periphery: others controlled the accounts once opened, decided what funds moved in and out, and reaped the proceeds. His contribution was a one-time act of facilitation performed for a flat fee. Under the factors enunciated in *Shonubi*, *supra*, every consideration favors the adjustment—his relationship to the other participants was subordinate; his awareness of the nature and scope of the enterprise was minimal to nonexistent; and while opening the accounts had utility to the scheme, the Second Circuit has never held that mere utility defeats a mitigating role. The question is comparative culpability, not indispensability.

Mr. Abramov's participation was narrow, discrete and ministerial. He received $12,500— literally two-tenths of one percent of the money that flowed through the accounts. This disparity between the over $6 million figure driving the offense level and Mr. Abramov's personal gain is exactly the disparity identified in the Application Note as warranting a mitigating role adjustment. This disparity is exemplified by the $1,457,898.33 forfeiture ordered in the Zarbailov matter.

For the foregoing reasons, we respectfully submit that the Court should find that Mr. Abramov was a minor participant in the offense and reduce his offense level by to levels pursuant to U.S.S.G. § 3B1.2(b). In the alternative these same facts support a downward variance pursuant to 18 U.S.C. § 3553(a).

In addition to the foregoing, Mr. Abramov's personal history and circumstances present mitigating factors we ask the Court to consider.

c. **Personal History and Characteristics of Renat Abramov**

Pursuant to 18 U.S.C. § 3553(a)(1), the Court must consider "the history and characteristics of the defendant." A full accounting of Mr. Abramov's life—from his birth amid conflict, through

a childhood marked by hardship, to his decade of steady work and devoted family life in the United States—supports a sentence below the advisory guideline range.

Mr. Abramov has been working with the Aleph Institute for several months. The Institute provided a letter to the Department of Probation to aid in the preparation of the Presentence report. *See* Ex. A, Aleph Institute Letter Addressed to Probation Officer Ralph. This letter was supplemented by a letter from the Aleph Institute addressed to Your Honor (*see* Ex. B) and a video (*see* Ex. C) in which Mr. Abramov's life history and present circumstances are recounted.[3]

### i.    Family History and Religious Persecution

Renat Abramov was born on August 3, 1989, in Quba, Azerbaijan, the oldest of four children born to David Abramov and Dzhavakhir Danilova. He is a Kafkazi Jew, part of an ancient Jewish community from the Caucasus Mountains with deep religious and cultural traditions, and his family's history is marked by profound religious persecution. His paternal grandfather survived the Dachau concentration camp during the Holocaust; his maternal great-grandfather was killed by Soviet authorities for practicing Judaism; and his grandfather was imprisoned for the same reason. It was ongoing antisemitism in Azerbaijan that ultimately drove the family to seek a new life in the United States.

The family arrived in New York when Mr. Abramov was just ten years old, and the transition was immediately complicated: his father remained behind in Azerbaijan to care for Mr. Abramov's hospitalized grandmother, and after the September 11th attacks, was unable to rejoin the family in the United States as planned. The family was forced to relocate again in 2003, this time to Moscow, to reunite with him. Mr. Abramov returned to New York in 2009, when he enrolled first at Kingsborough Community College and later at Brooklyn College, working toward a CPA

---

[3] Ex. C will be provided to the Court under separate cover given that electronic media files cannot be filed by ECF.

credential. He completed 147 of the required 150 credits before leaving school, short of graduation, in order to work and help support his family financially—a sacrifice that speaks directly to his sense of familial responsibility rather than any lack of ambition or ability.

That sense of responsibility became the defining feature of Mr. Abramov's young adulthood. As his father struggled to find steady work and adjust to a new language and country, his drinking increased, bringing periods of anger and tension into the household. Mr. Abramov, from a young age, recognized the toll this took on his mother, and stepped into a supportive role for her—emotionally and financially—that continues to this day. She still relies heavily on him for daily, financial, and emotional support and has witnessed Mr. Abramov's commitment to his own young family. She asks the Court to hear the words "from [her] heart":

> … I want to tell the judge something else, something maybe more important. I come from Azerbaijan. Where I grew up, the fathers did not do so much with the children, this was normal, this was how it was, the mother did this work. Renat did not want this for his own sons. He is not like the fathers I knew. He takes his boys to school. He helps them with schoolwork. He goes to their activities. He is there for them every day, not only when it is easy. I have two grandsons. They are young. They need their father very much right now, in these years. I am afraid for them more than I am afraid for myself. I am old, I have lived my life already. But they are just beginning theirs, and they need him. I am not asking the judge to forget what happened. I am only asking the judge to see the whole of my son, not only this one part. He has spent his life taking care of people who could not take care of themselves. His mother. His siblings. Now his own sons.

She ends her letter to the Court respectfully asking for mercy for him and their "family who depends on him." *See* Ex. D, Letters in Support of Renat Abramov at page 2. Mr. Abramov's father, David Abramov, now sixty-seven years of age, also relays that people "depend on him every day." David Abramov deeply regrets the harm his "own problems" caused his family writing

16

that he was "not the father [he] should have been," and acknowledges that Mr. Abramov "had to grow up too fast" as a result. *Id.* at pages 3 to 4.

    ii.   <u>Employment, Marriage, Fatherhood, and a Household That Depends on Him</u>

In 2017, Mr. Abramov married Lorena Abramova, who had worked as a nurse in Moscow before immigrating to the United States and passing the necessary examinations to practice here, eventually becoming an ICU nurse at Coney Island Hospital. Mr. Abramov, meanwhile, worked his way from a part-time bank position into full-time, stable employment, driven by the dual responsibility of supporting his own growing family while continuing to help his parents. The couple had two sons, ████, born in 2019, and ████, born in 2021.

From 2015-2016, Mr. Abramov worked at Ultimate Billing in Brooklyn as a credential specialist. From 2018 to 2019 he worked at Santander Bank in Borough Park. He started as a teller and later transferred to another Brooklyn Branch of Santander. In 2016, Mr. Abramov began operating a hookah business catering to local restaurants.[4] He operated this business until a few months ago.

Mr. Abramov has been a constant, stabilizing presence in his sons' lives. Because Lorena works overnight shifts three nights a week and sleeps during the day on those days, the household depends heavily on Renat's day-to-day involvement: he wakes the children, prepares their meals, drives them to and from school, manages homework and evening routines, and puts them to bed. His older son, ████, who initially struggled with English because Russian is the primary language spoken at home, has made meaningful progress specifically because of Renat's consistent attention and support. ████, though only seven, regularly turns to his father with questions about faith and

---

[4] A "hookah" is akin to a waterpipe and is a centuries old device used to heat and smoke flavored tobacco. We ask the Court to note that Mr. Abramov did not fail to disclose to that he operated his hookah business in Mr. Zarbailov's restaurant. This was disclosed immediately after his arrest and to Pretrial Services.

Jewish practice. His younger son, █████, has struggled at times with focus, and it is Renat's hands-on involvement—helping with school routines, homework, and activities like swimming lessons—that has helped █████ grow more patient and settled.

Renat also shoulders much of the practical burden of the household, from paperwork to school communications, particularly because Lorena has very limited family support of her own in the United States: both of her parents have passed away, and she has no close family nearby. Lorena has expressed real fear about the prospect of managing the household and children without him:

> I don't know how to write the part of this letter where I try to describe what it would mean for our boys to lose him from their daily lives right now, at seven and five years old, in the years when they're learning who they are partly by watching who he is. I work nights so that our family can have what it needs, and that only works because I know he is home with them. I don't think I can fully put into words what it would mean for that to no longer be true. I only know that I've seen what he becomes when our family needs him most, and I'm asking the Court to weigh that when deciding what happens next.

*Id.* at page 6.

iii.    <u>Genuine Rehabilitation and Spiritual Growth Since Arrest</u>

Since the instant offense, Renat has undertaken a genuine and well-documented process of self-reflection and rehabilitation. He has openly acknowledged that his conduct was not victimless and that he failed to uphold the trust placed in him, and he has spoken candidly about the strain and uncertainty his actions have caused his wife and children. Rather than avoid that reckoning, he has turned toward his faith as a source of accountability and structure, studying Torah daily, observing Shabbat—a practice he set aside during the period of his offense conduct, when he often worked on Saturdays—and rebuilding his daily life around values of integrity, patience, and responsibility.

18

In his own words, Renat describes his conduct as having "shattered" his old self, and he has committed himself to being an example of character and responsibility for his sons rather than repeating old patterns. *See* Ex. B, at page 9. The sincerity and impact of this transformation is corroborated by his family: his son ███ was moved enough by the change he saw in his father to ask, on his own initiative, to leave public school for a Jewish school, telling his father he wanted to be part of the calmer, more grounded life he now saw modeled at home.

iv.    Letters in Support of Mr. Abramov

In further support of Mr. Abramov, attached are letters from individuals who know Mr. Abramov in different capacities, we detail four of those individuals below—a business associate, a synagogue leader who has known him since childhood, a relative, and a former colleague. Each writer independently corroborates the same portrait of a man defined by consistent generosity, devotion to family, and a genuine, ongoing spiritual transformation. These letters are attached as part of Ex. D and are summarized below.

*Sergei Iurasov — Business Associate*

Mr. Iurasov has worked alongside Mr. Abramov for two years through Mr. Abramov's hookah catering business, Art of Smoke Hookah Catering. He describes Mr. Abramov as the first person to offer him a job when he arrived in the United States from Russia with his wife and son, and as someone who guided his family through nearly every challenge of resettling in a new country. When landlords refused to rent to his family because they lacked a rental history, Mr. Abramov personally served as the guarantor on their lease. Mr. Iurasov also recalls that Mr. Abramov would regularly include his son in outings with his own children so that the child would not be left alone while his parents worked. He acknowledges Mr. Abramov's legal troubles without excusing them, but emphasizes that Mr. Abramov consistently helps others without being asked,

19

and expresses hope that he will be able to remain with his family and return to his business. *Id.* at page 17.

*Eduard Pardilov — Synagogue Gabbai*

Mr. Pardilov, the Gabbai (assistant to the Rabbi) at Mr. Abramov's synagogue, has known him since childhood. He describes Mr. Abramov's lifelong involvement in the synagogue and community, noting that Mr. Abramov began working to support his family by age fifteen and has long helped organize community celebrations. Mr. Pardilov speaks in detail to Mr. Abramov's recent spiritual transformation—regular Torah study, newly-adopted Shabbat observance (which he had long wanted to keep but could not while working at his bank job), and a calmer, more grounded demeanor. He also highlights a mentorship program Mr. Abramov has proposed to connect young members of the community finishing school with professionals in their fields of interest. Mr. Pardilov asks that Mr. Abramov be permitted to remain part of the community and continue raising his children. *Id.* at page 18.

*Asher Abramov — Relative*

Asher Abramov describes Renat as one of his favorite family members and emphasizes his consistent respectfulness toward people regardless of age or status. He recounts a personal example of Mr. Abramov pausing his work to sit and spend time with him during a busy moment, and describes him as non-judgmental and accepting of people from all backgrounds. He notes that Mr. Abramov's religious observance is a recent development, which he offers as evidence of Mr. Abramov's genuine capacity for disciplined self-improvement, and he expresses his willingness to help Mr. Abramov in any way needed. *Id.* at page 16.

*Eleonora Lozhinskaya — Former Colleague*

Ms. Lozhinskaya worked alongside Mr. Abramov at Bank of America for five years. She describes him as a selfless, honest colleague who consistently prioritized others' needs, recalling

20

a specific instance in which he made sure she had adapted to a new work system before returning to his own tasks. While it was at Bank of America that Mr. Abramov committed the crime to which he has pled, this was not his focus at this bank or the other banks at which he worked.[5] As detailed herein, his goal at the bank was to move up with promotions that were earned, in large part, by opening new accounts. Ms. Lozhinskaya describes Mr. Abramov as a devoted father whose love for his family is openly evident, and notes his growing spirituality and his own characterization of this period as a turning point for personal growth rather than an endpoint. *Id.* at pages 19-20.

Taken together, these letters—from a business associate, a religious leader, a family member, and a former colleague—offer a consistent and independently corroborated account of Mr. Abramov's character: a man who helps others without being asked, who has been a devoted father and family man throughout, and who has undertaken a genuine and sustained spiritual transformation since his arrest. This consistency, across relationships spanning decades and different areas of his life, supports the Court's consideration of a variance in this case.

d.

---

[5] Mr. Abramov was never accused or suspected of any untoward behavior at the other financial institutions at which he was employed.

21



   e.   **18 U.S.C. § 3553(a)(2)(A), (B) and (C): The Need for the Sentence Imposed to Reflect the Purposes of Punishment Contained in the Federal Sentencing Statute**

Any kind of fraud on the Government or private individuals is a serious offense for which appropriate punishment must ensue. The question is what sentence, which must be determined on an individual basis, will be sufficient but not greater than necessary to achieve the goals of punishment. We have set forth Mr. Abramov's role in the offense and his personal history and circumstances. We respectfully submit that these factors, along with the remaining statutory factors strongly support a variance.

With regard to specific deterrence, Mr. Abramov was never pre-disposed to criminal conduct and the very fact of his arrest and conviction and the impending consequences, will suffice to ensure that he will never re-offend.

With respect to general deterrence, a justifiable concern of this and other sentencing courts, we respectfully submit that others similarly situated would hesitate to commit this offense knowing that it would result in a felony conviction and the negative impact it will have on personal lives. This is the factor that is often untethered from the specific individual before the Court as a "message" needs to be sent to the community at large. We ask that the Court consider this message as directed to those in Mr. Abramov's position in life. The fact of a felony conviction alone for

22

someone in Mr. Abramov's position is often understated as a deterrent to future criminality by others.

### Conclusion

As with all sentencing proceedings, there is the offense which must be punished and the human being that must be considered in meting out the just result. It is these details which inform that "uniform and constant" principle "that every convicted person [be considered] as an individual and every case as unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81 (1996).

Renat Abramov has otherwise been a law-abiding man committed to supporting his family in the manner society values and expects. He regrets his conduct, he accepts responsibility for it and we respectfully submit that he deserves a chance to return to his family to continue caring and providing for them while saddled with a serious felony conviction.

We submit that based on the extant circumstances, a variance from the guidelines would more than amply serve the objectives of 18 U.S.C. § 3553(a).

Thank you for your courtesy and consideration.

Dated:      July 27, 2026
            New York, New York

                                          Respectfully submitted,

                                          _____/s/_____
                                          JAMES KOUSOUROS

23