

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SP/JPL:LS
F. #2024R00767

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 3, 2026

<u>By ECF</u>

The Honorable Rachel P. Kovner
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    United States v. Renat Abramov
> <u>Criminal Docket No. 26-7 (RPK)</u>

Dear Judge Kovner:

On August 10, 2026, the Court is scheduled to sentence the defendant Renat Abramov following his guilty plea to conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h). The government respectfully submits this letter in advance of the sentencing and in response to the defendant's sentencing submission. <u>See</u> ECF No. 43 ("Def. Mem."). In view of the seriousness of the offense, the defendant's role in the scheme, and the urgent need for deterrence, the government respectfully requests that a sentence within the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") range of 46 to 57 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing.

I.    <u>Background and Procedural History</u>

A.    <u>The Transnational Health Care Fraud and Money Laundering Scheme</u>

The defendant was charged in connection with his role in a sophisticated transnational health care fraud and money laundering scheme. The investigation revealed that members of a criminal organization, based in Russia and elsewhere, purchased durable medical equipment ("DME") companies across the United States that were already enrolled with Medicare and other health care benefit programs. <u>See</u> Presentence Investigation Report ("PSR") ¶ 7. The fraudsters executed these purchases by paying foreign nationals and others to serve as nominee owners of these DME companies (the "Scheme DME Companies"). The perpetrators created corporate records that falsely indicated that the nominee owners controlled the Scheme DME Companies when, in truth and fact, foreign-based leadership of the criminal scheme directed the nominee owners and maintained control of the companies. Investigators have identified dozens of Scheme DME Companies across the country that have participated in this scheme. <u>Id.</u>

After the criminal organization gained control over the Scheme DME Companies, it rapidly submitted billions of dollars' worth of false health care claims to Medicare for DME (primarily for continuous glucose monitors and urinary catheters) that was not medically necessary

and was not dispensed as represented.  Id. ¶ 8.  Hundreds of thousands of Americans reported their concerns to Medicare and its contractors after receiving explanation of benefit forms that reflected their purported receipt of DME that they did not in fact receive or need.

A critical part of the scheme was the deposit and transfer of the health care reimbursements, i.e., the proceeds of the fraud scheme.  The criminal organization directed nominee owners to open multiple bank accounts in the names of each Scheme DME Company for the purpose of receiving these payments from insurers.  Id. ¶ 9.  To open financial accounts for the Scheme DME Companies, the criminal organization armed its nominee owners, many of whom were not lawfully present in the United States, with documentation that falsely showed that straw owners controlled the DME companies.

Once the straw owners opened bank accounts in the names of the Scheme DME companies, health care reimbursements were deposited into these accounts.  Id.  Although vigilance by law enforcement and the Centers for Medicare and Medicaid Services prevented the criminal group from receiving the vast majority of the funds that it conspired to steal from Medicare, the scheme nonetheless resulted in payments to Scheme DME Companies from private health insurance companies acting in the role of Medicare supplemental insurers estimated to be nearly $900 million.  Medicare made payments to the Scheme DME Companies of approximately $41 million.  Once the funds were deposited, members of the criminal organization rapidly transferred the funds to intermediaries in the United States and to accounts overseas.  Id.

B.    Defendant's History and Characteristics

As set forth in detail below, the defendant is a naturalized United States citizen and a dual citizen of Azerbaijan.  The defendant has been employed as a retail banker since 2018.  Id. ¶¶ 62-63.  Beginning in or around at least May 2019 and until his arrest in September 2024, the defendant was employed as a relationship manager at a major American bank.  Id. ¶¶ 10, 62.  During the relevant period, the defendant was assigned to a retail branch located in the Sheepshead Bay section of Brooklyn, New York.[1]

C.    The Offense Conduct

From at least September 2023 until his arrest in September 2024, the defendant acted effectively as a concierge banker for participants in the health care fraud and money laundering scheme, helping with efforts to transfer existing bank accounts of Scheme DME Companies into the names of the straw owners, opening new accounts for the Scheme DME Companies, and assisting with wires of fraud proceeds out of the country.  The defendant assisted at least six straw owners and at least one money launderer.

Initially, the defendant opened bank accounts for two shell companies belonging to co-conspirator Elnar Zarbailov, which Zarbailov utilized to launder fraud proceeds associated with multiple Scheme DME Companies.  On March 24, 2021, the defendant opened a business bank account for one shell company, AGL USA Inc.  On May 23, 2023, the defendant opened a business

---

[1]    The defendant also owns a business engaged in catering social events with waterpipes, called Art of Smoke Hookah Catering Inc., which operated from Emmons Palace, a restaurant and lounge owned by co-conspirator Elnar Zarbailov.  PSR ¶ 61; Def. Mem. at 17 n.4.

bank account for another shell company, Royal Goods Inc.  See PSR ¶ 12.  Between July and September 2023, Zarbailov used both accounts to deposit and launder fraud proceeds from four Scheme DME Companies totaling nearly $1 million.[2]

Then, in September 2023, the defendant made unusual efforts to assist with the transfer of an existing business account of a Scheme DME Company, Pretty in Pink Boutique, Inc. ("Pretty in Pink"), based in El Paso, Texas, to a straw owner.  See id. ¶ 13.  Scheme participants purchased Pretty in Pink from a prior legitimate owner in El Paso and registered the company in the name of straw owner, a foreign national who had recently arrived in Brooklyn, New York from Estonia.  On behalf of the straw owner, the defendant interceded with bank colleagues in El Paso, in an effort to transfer the DME company's existing bank account into the name of the straw owner. Id.  The bank staff in El Paso became alarmed when they learned that the counterparties to the sale of the DME company possessed up-to-date information about the status of the bank account that they could have only obtained from a bank insider.  The bank staff in El Paso reviewed the bank's electronic files and discovered that the defendant had been accessing the profile of Pretty in Pink multiple times over the span of a week.  During a subsequent interview with a bank investigator, the defendant acknowledged assisting with the attempted transfer of the Pretty in Pink account to the new owner but disclaimed any involvement in fraud or awareness of any fraud in connection with the account.  The defendant's dogged efforts were ultimately unsuccessful because law enforcement seized the Pretty in Pink account pursuant to a warrant.

Undeterred by the experience with Pretty in Pink, the defendant continued to assist foreign nationals acting as straw owners of the Scheme DME Companies even after he was placed on notice concerning suspected fraud.  Between September 2023 and December 2023, the defendant opened new business bank accounts for foreign nationals acting as the straw owners of four Scheme DME Companies: Konaniah Medical Equipment & Supplies LLC ("Konaniah"), G&I Ortho Supply Inc. ("G&I Ortho"), Medical Home Care Inc. ("Medical Home Care"), Argo Medical Supplies & Services Inc. ("Argo").  Id. ¶ 14.  The government's investigation revealed that the straw owners were directed by their handlers to travel specifically to the branch located in Sheepshead Bay, where the defendant would attend to their needs.  Typically, the defendant had advance notice that the straw owners would be coming and readily assisted them.  Where the defendant was unavailable, the straw owners would wait for an excessive period of time in order be assisted specifically by defendant, rather than by other branch personnel.  Id. ¶ 15.  In cases in which the defendant was unable to open accounts himself, he directed the straw owners to visit his acquaintances at other banks or branches for assistance.

As an example, surveillance footage obtained from the branch shows the straw owners of Argo following the defendant into his office on December 19, 2023, the same day that they signed a signature card opening a business account for Argo.

---

[2]    On May 18, 2026, this Court sentenced Zarbailov to a Guidelines term of 37 months' imprisonment following his guilty plea to one count of conspiracy to commit money laundering in connection with this offense conduct.  See Judgment, United States v. Zarbailov, No. 25-CR-300 (RPK) (E.D.N.Y.), ECF No. 47.



Date: 12/19/2023 10:52:39.40
Camera: LOBBY 360 IP
Event: Surveillance
DVR: SHEEPSHEAD-BAY-103141

After the defendant opened business accounts of the Scheme DME Companies, he continued to assist straw owners with financial transactions, including depositing checks from health insurance companies (representing proceeds of the health care fraud scheme) and sending outbound wires of the fraud proceeds. Id. ¶ 16. Moreover, when the defendant's bank placed the business accounts of several Scheme DME Companies on hold based on suspicion of fraud, the scheme supervisors directed the straw owners to visit the defendant in an effort to lift the holds on the accounts. Id. The defendant provided the straw owners with updates on the status of frozen accounts as the straw owners and their handlers attempted intercede with the bank to lift the holds.

During the charged conspiracy period, $8,065,921.64 in fraud proceeds was credited into the accounts of the Scheme DME Companies that the defendant had opened. The total debited from these accounts was $8,033,621.72. Id. ¶ 15.[3] The defendant's gain from the scheme is reflected in the agreed forfeiture money judgment of $12,500. Id. ¶ 86.

D.    Procedural History

On September 19, 2024, the defendant was arrested at John F. Kennedy International Airport on a complaint charging him with conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h). Id. ¶ 17.

On February 3, 2026, the defendant waived indictment and pleaded guilty, before the Honorable Peggy Kuo, United States Magistrate Judge, pursuant to a plea agreement, to a single-count information charging him with conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h).

II.    The Sentencing Guidelines

A.    Defendant's Guidelines Calculation

The government agrees with the Guidelines calculation in the PSR, which results in a total adjusted offense level of 23. See PSR ¶¶ 21-31.

| | | |
|---|---|---:|
| Base offense level (U.S.S.G. § 2S1.1(a)(2)) | | 8 |
| Plus: | Loss amount greater than $3,500,000 (U.S.S.G. § 2B1.1(b)(1)(J)) | +18 |
| Plus: | Conviction under § 1956 (U.S.S.G. § 2S1.1(b)(2)(B)) | +2 |
| Less: | Acceptance of responsibility (U.S.S.G. § 3E1.1(a), (b)) | −3 |
| Less: | Zero-point offender (U.S.S.G. § 4C1.1) | −2 |
| Total Offense Level: | | 23 |

With a total adjusted offense level of 23, and Criminal History Category I, the Guidelines range of imprisonment is 46 to 57 months. Id. ¶ 75.

In his plea agreement, the defendant stipulated to this Guidelines calculation, except that the defendant reserved the right to argue that a mitigating role adjustment should apply pursuant to U.S.S.G. § 3B1.2.

---

[3]    The amount laundered through the accounts of the Scheme DME Companies that the defendant opened does not include the nearly $1 million in fraud proceeds laundered by co-conspirator Elnar Zarbailov through the two accounts that the defendant opened for Zarbailov's shell companies. See PSR ¶ 12

B.       The Loss Table Does Not Overstate the Defendant's Comparable Culpability

The defendant argues erroneously that his Guidelines calculation overstates his culpability because it is "entirely driven by the loss amount of the underlying fraud with which he had nothing to do." Def. Mem. at 6; see also id. at 10 ("The problem is that the guidelines consider a loss amount as applicable to all defendants irrespective of their role in the offense"). This could not be further from the truth.

As a co-conspirator who participated in the scheme as a money launder, the defendant is convicted only of violating Title 18, United States Code, Section 1956(h), rather than of underlying specified unlawful activity, such as health care fraud or health care fraud conspiracy. Accordingly, the defendant is held accountable, by way of the loss table at U.S.S.G. § 2B1.1(b)(1), as applied through U.S.S.G. § 2S1.1(a)(2), only for the "value of the laundered funds" with which he was involved, rather than the intended loss of the underlying health care fraud scheme. Here, that value corresponds to the more than $8 million transferred through the four accounts that the defendant opened for the straw owners of the Scheme DME Companies. That value pales in comparison to the intended loss of the health care fraud conspiracy, with which the defendant was not charged, which is measured by the billions of dollars' worth of fraudulent claims submitted by the Scheme DME Companies. See U.S.S.G. § 2B1.1 cmt. n.3(E)(viii) (the aggregate dollar amount of bills submitted to a government health care program may serve as prima facie evidence of intended loss). In short, the Guidelines calculation accurately reflects the defendant's offense conduct and does not overestimate his culpability or unreasonably conflate him with participants of the health care fraud scheme.

C.       The Defendant Does Not Merit a Minor Role Adjustment

The defendant's argument that he merits a minor role adjustment misapprehends the relevant standard and his role in the scheme. Section 3B1.2 of the Guidelines provides a mitigating role adjustment to a defendant's offense level "[b]ased on the defendant's role in the offense." U.S.S.G. § 3B1.2. Eligibility for a such an adjustment "depends on the nature of the defendant's role in comparison to that of his co-participants in his criminal activity." United States v. Alston, 899 F.3d 135, 150 (2d Cir. 2018). The Guidelines specify five "non-exhaustive . . . factors" that a "court should consider" in determining a defendant's relative culpability. See U.S.S.G. § 3B1.2 cmt. n.3(C). The defendant bears the burden of proving his entitlement to a mitigating role adjustment by a preponderance of the evidence. See United States v. Esteras, 102 F.4th 98, 107 (2d Cir. 2024).

Here, the defendant's role adjustment must be evaluated from the perspective of the money laundering conspiracy of which he stands convicted, as opposed to the health care fraud scheme in which he was not charged. Applying this correct standard, it is apparent that the defendant is anything but a minor participant in the money laundering scheme. As a retail banker, the defendant possessed a status that set him apart from other participants in the scheme. Because most of the straw owners were foreign nationals who were not fluent in English and lacked basic familiarity with banking in the United States, the defendant—fluent in English and a bank employee—served as a guide to the straw owners with respect to accessing and utilizing the financial system. While the defendant downplays his participation as "ministerial," Def. Mem. at 13-14, his role was valued by the scheme supervisors who repeatedly urged the straw owners to visit the defendant at the branch to open accounts, to get assistance with wires, and to obtain updates about the status of frozen accounts. Moreover, nearly none of the straw owners who have

6

been convicted of money laundering conspiracy and sentenced in various federal districts throughout the country have received a minor role adjustment, and there is no valid basis why a retail banker who helped multiple straw owners access American financial system merits one.[4]  In short, the Probation Department correctly concluded that the defendant does not merit a role adjustment, PSR ¶ 25, and the defendant fails to carry his burden of proving his entitlement to the same.

### III.    A Sentence Within the Guidelines is Appropriate

#### A.    Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns.  543 U.S. 220, 245 (2005); see 18 U.S.C. § 3553(a).  Subsequent to Booker, the Second Circuit has held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)."  United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).  Although the Second Circuit declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, it cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum."  Id. at 113.

Subsequently, in Gall v. United States, 552 U.S. 38 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow:  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall, 552 U.S. at 49 (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the Court] may not presume that the Guidelines range is reasonable.  [The Court] must make an individualized assessment based on the facts presented."  Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides numerous factors that the Court must consider in sentencing the defendant.  These factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law and to provide just punishment, (b) afford adequate deterrence to criminal conduct, (c) protect the public from further crimes of the defendant, and (d) provide the defendant with appropriate education or vocational training; (3) the kinds of sentences available; (4) the Guidelines range; (5) pertinent policy statements of the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution.

---

[4]    That the defendant opened accounts "for a flat fee," Def. Mem. at 14, rather than a percentage of the amount laundered is consistent with the manner in which average scheme participants, including straw owners, were paid and is not a basis to conclude that he was a minor participant relative to the straw owners.

7

B.   <u>Discussion</u>

The government respectfully requests that the Court impose a sentence within the Guidelines range of 46 to 57 months' imprisonment because such a sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing.  <u>See</u> 18 U.S.C. § 3553(a).

1.   <u>The Nature and Circumstances of the Offense Warrant a Substantial Sentence</u>

The nature and circumstances of the offense warrant a Guidelines sentence.  As set forth above, though the defendant was not a leader or manager, he facilitated a critical element of the scheme, the laundering of the fraud proceeds through the financial system.  As an employee of a major bank, the defendant should have served as the first line of defense to prevent criminals from utilizing financial institutions to further their criminal activities.  Instead, the defendant actively assisted the foreign-based criminal organization, effectively as a concierge banker for participants in the scheme.

While the defendant minimizes his role as "ministerial," Def. Mem. at 13-14, the defendant's conduct evidences a more active role vis-à-vis other scheme participants.  The defendant (i) assisted with efforts to transfer existing bank accounts of Scheme DME Companies into the names of straw owners, (ii) opened at least four new accounts for the Scheme DME Companies, (iii) assisted straw owners with the deposit and transfer of fraud proceeds out of the country, and (iv) served as a resource when the bank placed accounts under review on suspicion of fraud.  The defendant also opened accounts for a co-conspirator, Elnar Zarbailov, who used those accounts to launder the fraud proceeds of additional Scheme DME Companies.  In cases in which the defendant was unable to open accounts himself, he directed the straw owners to visit his acquaintances at other banks or branches for assistance.

The defendant acted with tenacity, despite alarms sounded by his colleagues, and even after being interviewed by a bank investigator concerning suspected fraud.  Over time, his conduct permitted more than $8 million in fraud proceeds from federally funded health care benefit programs to be diverted and laundered, in addition to the nearly $1 million that Zarbailov laundered through the accounts that the defendant opened for Zarbailov's shell companies.

2.   <u>The History and Characteristics of the Defendant Do Not Support a Downward Variance</u>

The most salient feature of the defendant's history and characteristics is his status as a retail banker.  The defendant utilized his training and experience at major banks going back to 2018 to help a foreign-based criminal organization access the financial system in the United States.  Although the Guidelines calculation does not hold the defendant accountable for the abuse of public or private trust or the use of a special skill within the meaning of Section 3B1.3, the defendant's conduct represents a serious breach of the law and of the trust placed in him by the financial institution for which he worked.  His provision of inside information to outsiders was enough to alarm his colleagues, PSR ¶ 13, while his opening of accounts assisted in the looting of the public fisc in a country that welcomed the defendant as an immigrant.  The substantial breach of trust should weigh against any downward variance from the stipulated Guidelines range.

The Court should reject several aspects of the defendant's personal history and characteristics that he highlights because these are irrelevant to the Court's sentencing decision. For example, the challenges faced by the defendant's great-grandfather and grandfathers in the Soviet era, Def. Mem. at 15, are not facts that should inform his sentencing in connection with a money laundering scheme in Brooklyn, New York in the charged period. Additionally, while the government is unable to meaningfully assess the veracity of the defendant's narrative of "extreme" religious persecution in Azerbaijan, id. at 1, 15, it is noteworthy that this claim stands in glaring contrast to the widely reported conditions in that country. See e.g., Anshel Pfeffer, *Azerbaijan, The Land of No Anti-Semitism*, HAARETZ (Mar. 4, 2013), available at https://www.worldjewishcongress.org/en/news/anshel-pfeffer-azerbaijan-the-land-of-no-anti-semitism-haaretz; Rabbi David Wolpe, *Azerbaijan Is an Oasis of Tolerance in the Middle East*, TIME (Nov. 5, 2015), https://time.com/4099548/azerbaijan-is-an-oasis-of-tolerance-in-the-middle-east/. Similarly, the defendant's self-reported turn toward religious observance "since arrest," Def. Mem. at 18, should not shield him from appropriate accountability for his criminal conduct. The Court should disregard these aspects of the defendant's history and characteristics as self-serving and irrelevant to the sentencing decision.

3. <u>A Guidelines Sentence Reflects the Seriousness of the Offense, Provides Just Punishment, and Affords Adequate Deterrence</u>

The defendant's meaningful contribution to one of the largest, most brazen, and most technologically sophisticated health care fraud schemes ever investigated by the Department of Justice requires a sentence that reflects the seriousness of the crime, provides just punishment, and promotes adequate deterrence. The defendant's offense conduct does not represent "one-time act of facilitation" as the defendant claims misleadingly. See Def. Mem. at 14. Rather, the defendant made a series of calculated decisions to assist multiple participants of a transnational criminal scheme over a prolonged period of time, despite growing alarms inside the bank. A Guidelines sentence properly reflects the seriousness of the offense and provides just punishment for his involvement.

A meaningful sentence is also necessary to deter similarly situated bank employees, including individuals in the defendant's professional and social circles, from being corrupted by criminal organizations. Schemes like the one perpetrated in this case threaten the integrity of the American health care system and the financial system. As the Second Circuit has noted, significant sentences are appropriate in white collar crimes to promote deterrence. See, e.g., Watts v. United States, No. 21-2925, 2023 WL 2910634, at *4 (2d Cir. Apr. 12, 2023); United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013) (noting that some feel that white collar crimes are a "game worth playing").

The sentence that the Court imposes on this defendant will travel fast within the professional and social networks of the defendant and his co-conspirators. A below-Guidelines sentence, such as the one the defendant urges this Court to impose, would underestimate the seriousness of the offense and send a message to financial services personnel and health care fraudsters in the District that assisting criminals may be a "game worth playing," Goffer, 721 F.3d at 132, because even the small subset of defendants caught and prosecuted are unlikely to receive meaningful jail time. By contrast, a sentence within the Guidelines would demonstrate that criminal justice system will penalize the facilitation of money laundering by criminal organizations and such conduct is not worth the risk.

9

### 4.   Avoiding Unwarranted Sentencing Disparities

A Guidelines sentence is also necessary to avoid unwarranted sentencing disparities among similarly situated defendants.  In May 2026, in this Court sentenced the defendant's co-conspirator Elnar Zarbailov to a Guidelines term following his plea of guilty to one count of conspiracy to commit health care fraud.  In a case where the "value of the laundered funds" was approximately $1.5 million, the Court sentenced Zarbailov to 37 months' imprisonment.  See Judgment, United States v. Zarbailov, No. 25-CR-300 (RPK) (E.D.N.Y.), ECF No. 47.  The defendant's role, which was comparable to that of Zarbailov, should be punished, at minimum, by a corresponding term of imprisonment.

Similarly in United States v. Ayala, an unrelated but instructive recent case in the District of New Jersey, the defendant was a former retail banker at TD Bank N.A. who facilitated the laundering of narcotics proceeds to Colombia by, among other things, opening accounts in exchange for more than $6,000 in bribes.  In a case in which the value of the laundered funds was approximately $1.3 million, the court sentenced the defendant to 24 months in prison.  See Judgment, United States v. Ayala, No. 26-CR-4 (ES) (D.N.J.), ECF No. 34.  The defendant's sentence in this case should correspond to the substantially higher value of the laundered funds.

Federal sentencing statistics also show why a substantial custodial sentence is appropriate based on a nationwide comparison.  For the fiscal years 2021 through 2025, of the approximately 256 defendants whose Guidelines were based on a Total Offense Level of 23, a Criminal History Category I, and whose primary Guideline was Section 2B1.1, the average length of imprisonment was 36 months and the median length of imprisonment was 38 months.[5]  These federal statistics confirm that the defendant deserves a sentence in excess of that recommended by the Probation Department.

In sum, to avoid unwarranted sentencing disparities with similarly situated defendants in the District and nationally, the defendant's sentence in this case should be commensurate to his role in a massive scheme.

5.   ███████████████████████████████████████████



---

[5]   U.S. Sentencing Commission, *Judiciary Sentencing Information (JSIN)*, https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last visited July 30, 2026).

[6]



IV.    Forfeiture

The Court should impose a forfeiture money judgment in the amount of $12,500, as agreed in the defendant's plea agreement.  PSR ¶ 86.

V.    Conclusion

In sum, based on a balancing of the Section 3553(a) factors, the government respectfully submits that the Court should impose a Guidelines sentence of 46 to 57 months' imprisonment and order the defendant to pay forfeiture.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

LORINDA LARYEA
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

By:    */s/ Leonid Sandlar*
Leonid Sandlar
Trial Attorney, Fraud Section
Criminal Division
U.S. Department of Justice
(202) 993-4865

cc:    Clerk of the Court (RPK) (by ECF)
James Kousouros, Esq. (by ECF)
Cheyanne Ralph, U.S. Probation Officer (by email)